IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

MONTAVIOUS K. ASKEW,        )
#274336,                    )
                            )
    Plaintiff,          )
                            )
v.                          )       CASE NO. 2:19-CV-398-MHT-KFP
                            )
TIMOTHY ISAAC, et al.,      )
                            )
    Defendants.          )

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    BACKGROUND

Plaintiff, who is in custody of the Alabama Department of Corrections, filed a Complaint under 42 U.S.C. § 1983. Doc. 1. The Defendants remaining in this case have filed a Special Report and Answer and Supplemental Special Report with supporting evidentiary materials. Docs. 33, 39. The Court issued an Order requiring Plaintiff to respond to the Special Reports and advising him that he should support his response with sworn affidavits or other appropriate evidentiary materials. Doc. 40. The Order further warned that, unless Plaintiff showed "sufficient legal cause [within 15 days] why such action should not be undertaken," the Court may treat the Special Reports and supporting evidentiary materials as a motion for summary judgment and rule on the motion in accordance with the law after considering his response. *Id.* at 3. Plaintiff filed two responses to Defendants' Special Reports but did not show cause why the Court should not treat them as a motion for summary judgment. *See* Docs. 55, 59. Accordingly, the Court

treats the Special Reports as a motion for summary judgment and, as discussed below, recommends that it should be granted in part and denied in part.

Plaintiff filed his Complaint on this Court's form for § 1983 cases. Doc. 1. The Complaint alleges violations of the Eighth and Fourteenth Amendments and incorporates the factual allegations from an attachment. *Id.* Plaintiff alleges that, on June 29, 2017, he was experiencing chest pain following an incident on June 15, 2017, in which inmates stabbed him 19 times. Doc. 1-1 at 1. Plaintiff further alleges that he and his cellmate started "calling out to the rovers for medical help." *Id.* "[S]pecifically, Plaintiff called out to [Defendant] Officer Kelvin Key[] and told him that he was having chest pain and needed to go to the infirmary." *Id.* However, according to Plaintiff, Defendant Key "acted as if he did not hear [Plaintiff] and kept on going." *Id.* "Later," Plaintiff "sought help from [Defendant] Officer Timothy Issac[1] and Key to take him to the infirmary because he was experiencing pain, but [they] just ignored [Plaintiff]." *Id.*

Plaintiff further alleges that, at lunch time, he "stuck his arm out of the tray hole slot to tell the guards that he needed to go to the infirmary for chest pain." *Id*. Defendant Isaac "then grabbed [his] arm and forcibly broke it and stuffed it back in the tray slot, and then sprayed pepper spray into [P]laintiff's cell[,] blinding [him]." *Id.* at 2. Additionally, Plaintiff alleges that Defendants Captain Danzey and Lieutenant Thompkins later took him to the infirmary, "where [his] eyes were cleaned and pictures were taken." *Id.* Plaintiff adds

---

[1] Defendant Issac's last name is incorrectly listed as "Isaac" on the docket.

that he "eventually had to have 8 screws and a plate put in his arm as a result of the excessive force used on him." *Id.* at 3.[2]

As relevant here, Plaintiff names the following Defendants: (1) Officer Issac, (2) Officer Key, (3) Warden Myers, (4) Captain Danzey, and (5) Lieutenant Thompkins. Doc. 1 at 2. The events at issue occurred at the Easterling Correctional Facility, where all Defendants were employed. *See id.* Plaintiff seeks compensatory and punitive damages against each Defendant and unspecified injunctive relief. *Id.* at 4. Also, Plaintiff states that he seeks "pendent jurisdictio[n] of State Law Assault & Battery claims." *Id.*

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed fact is material (i.e., relevant) only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995) (citation omitted). A disputed material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The Court must view the evidence in the light most favorable to the nonmoving party and avoid weighing the evidence or making credibility determinations. *Ave. CLO Fund, Ltd. v. Bank of Am., N.A.*, 723 F.3d 1287, 1294 (11th Cir. 2013) (citations omitted).

---

[2] The remaining allegations in the attachment pertain to former Defendants Nurse Scott and Nurse Shivers, whom Plaintiff voluntarily dismissed. Docs. 52–54.

However, "[a]lthough all reasonable inferences are to be drawn in favor of the nonmoving party, an inference based on speculation and conjecture is not reasonable." *Hammett v. Paulding Cnty.*, 875 F.3d 1036, 1049 (11th Cir. 2017) (citation and quotation omitted). Likewise, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citation omitted). Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to create a genuine dispute of material fact. *See Anderson*, 477 U.S. at 252.

## III.   THE PARTIES' EVIDENCE

### A.   Plaintiff's Evidence

To support his responses to Defendants' Motion for Summary Judgment, Plaintiff relies primarily on (1) his affidavit in support of his first response, (2) the Complaint, (3) medical records, and (4) Plaintiff's post-use-of-force statement. The Court will treat Plaintiff's Complaint and supporting factual attachment as evidence when ruling on Defendants' motion. Plaintiff signed the form Complaint under penalty of perjury and, as a general matter, Federal Rule of Civil Procedure 10(c) allows incorporation by reference. Therefore, it is proper to treat the factual allegations in the attachment as a part of the Complaint and consider those verified factual allegations as evidence on summary judgment. *See Sears v. Roberts*, 922 F.3d 1199, 1203 (11th Cir. 2019) (citation omitted); Fed. R. Civ. P. 10(c). The Court declines to treat the factual contentions in his responses to Defendants' motion as evidence because Plaintiff did not sign them under penalty of perjury. *See Sears*, 922 F.3d at 1203; *Sharma v. Johnston*, 515 F. App'x 818, 819 (11th

Cir. 2013) (per curiam) ("Unsworn statements may [] not be considered when evaluating a summary judgment motion.") (citation omitted).

On June 15, 2017, at Easterling, Plaintiff had an altercation with another prisoner or prisoners in which he received multiple stab wounds over his entire body. *See, e.g.*, Doc. 20-2 at 10–13. Plaintiff was transported by EMS to a hospital. *See, e.g.*, *id.* at 11, 14. In addition to his multiple lacerations, Plaintiff was diagnosed with "left tension pneumothorax" and shortness of breath with "marked distress." *See id.* at 21, 24–26. According to Plaintiff's hospital records, the left tension pneumothorax was resolved with a chest tube. *Id.* at 25. Plaintiff also received multiple staples to various areas of his body. *Id.* at 28–29. On June 17, 2017, Plaintiff's chest tube was removed, and he was given medication intravenously for pain and itching. *Id.* at 33. Plaintiff was discharged from the hospital on that day with orders to follow up with his treating physician in two weeks. *Id.* at 26.

Upon returning to Easterling, medical staff evaluated Plaintiff, who complained of shortness of breath and chest pain in the area where his chest tube was removed. *Id.* at 35. Plaintiff was prescribed Tylenol, Naprosyn, Zantac, and Bactrim DS. *Id.* at 27, 35–37. On June 19, 2017, Plaintiff received a chest X-ray and was diagnosed with "[l]eft lower lobe pneumonia." *Id.* at 38. At an appointment on June 22, Plaintiff complained of or was diagnosed with "side pain." *See id.* at 39.

Plaintiff declares that, on June 29, 2017, he was in a cell at Easterling with his cellmate. Doc. 55-1 at 1. Around 8:30 a.m., he started experiencing "severe chest pain" associated with his injuries from the June 15 stabbing. *See id.*; Doc. 1-1 at 1. Plaintiff told

Defendants Issac and Key that he needed to go to the infirmary because of his severe chest pain, but they ignored him. *See id.*

Plaintiff declares that, at lunch time, Defendants Issac and Key came to his cell to "give out trays." Doc. 55-1 at 1. After his cellmate received a tray, Plaintiff "put [his] arm out [of] the tray slot and told [Defendant Issac]" that he did not want a tray, but "need[ed] to go to the infirmary" for chest pain. *See id.*; Doc. 1-1 at 2. "[Defendant] Issac told [Plaintiff] to move [his] arm and in response [Plaintiff] told him again that [he] wanted to go to the infirmary." Doc. 55-1 at 1. According to Plaintiff, Defendant Issac then grabbed and twisted Plaintiff's arm while it was in the tray slot, which caused it to break. Doc. 55-1 at 2; Doc. 1-1 at 2. "[Defendant] Issac then yelled 'Gas' and sprayed [Plaintiff] with pepper spray," which blinded him. *Id.* Plaintiff adds that Defendant "Key did nothing to stop [Defendant] Issac." Doc. 55-1 at 2. A few minutes later, Defendants Danzey and Thompkins took him to the health care unit, where he was decontaminated. Doc. 55-1 at 2; Doc. 1-1 at 2. Because of Defendant Issac's use of force, Plaintiff claims he suffered an arm fracture that required a surgery in which "8 screws and a plate" went into his arm. Doc. 55-1 at 2; Doc. 1-1 at 3.

Plaintiff's medical records show that he was evaluated on the same day Defendant Issac used force on him (i.e., June 29, 2017). Doc. 20-2 at 39–42. One such record states that Plaintiff complained of "elbow pain." *Id.* at 40. On June 30, nondefendant Dr. Darbouze increased Plaintiff's dosage of Tylenol and Zantac and re-prescribed Naprosyn. *See id.* at 43. On the same day, Plaintiff received an X-ray that revealed an "[a]cute proximal ulnar shaft fracture." *Id.* at 44. The X-ray report further stated that Plaintiff had

"[n]o acute cardiopulmonary disease" and that his "lung fields [were] clean without mass, infiltrate, congestion, or effusion." *Id.* The surgical consultant, nondefendant Dr. Chung, also diagnosed Plaintiff with an ulnar fracture. *Id.* at 45, 49–50.

On July 7, 2017, Dr. Chung operated on Plaintiff's arm. *Id.* at 50–54. A radiology report dated July 12 references "plate and screw fixation of the olecranon with surgical clips seen adjacent." *Id.* at 60.[3] Meanwhile, on July 24, Plaintiff complained of chest pain with an "[o]nset [d]ate" of July 21. *Id.* at 4. Dr. Darbouze and a nurse evaluated Plaintiff. *Id.* at 4–5. Their evaluation report contains no clear finding of chest pain. *See id.*

### B.    Defendants' Evidence

Defendants' summary judgment evidence largely consists of a series of affidavits from Easterling employees that contain similar factual assertions to the official incident report. Defendants cite to certain medical and investigatory records to support their affidavits, most notably the official incident report.

According to the incident report, on June 29 Defendants Issac and Key were distributing lunch trays in Plaintiff's housing unit around 11:30 a.m. Doc. 33-1. Defendant Issac ordered Plaintiff to remove his arm from the tray slot so he could give Plaintiff's cellmate his meal. *Id.* Because Plaintiff refused to comply with this order, Defendant Issac yelled "Gas!" and "sprayed a one second burst of Sabre Red, Chemical Agent, into [Plaintiff's] facial area." *Id.* Plaintiff then removed his arm from the slot and all force ceased. *Id.* Around 11:32 a.m., Defendant Thompkins was notified of the incident and

---

[3] A radiology report dated December 13, 2017, states that "[n]o fracture or dislocation [was] seen" and that Plaintiff had an "[i]ntact right forearm." Doc. 20-3 at 19.

entered Plaintiff's unit and handcuffed him. *Id.* Plaintiff told Defendant Thompkins that he "was trying to get some medical attention" and left his arm in the slot because it was "the only way he could get someone." *Id.* Defendants Danzey and Thompkins escorted Plaintiff to the health care unit, where he was decontaminated. *Id.*

Nondefendant Captain Cargle completed a use-of-force investigative report on June 30, 2017. Doc. 33-9. The investigative report largely repeats the incident report. *See id.* Cargle found that Defendant Issac's force was "necessary and justifiable" because he used "the minimum amount of force . . . to get [Plaintiff] to cease his negative behavior." *Id.*

Defendants Issac and Key submitted affidavits and supplemental affidavits. Doc. 33-7; Doc. 33-8; Doc. 39-1; Doc. 39-2. Consistent with the incident report, they declare that Defendant Issac sprayed Plaintiff with chemical agent after Plaintiff put his arm in the tray slot and refused to move it and that Plaintiff did not request medical treatment before Defendant Issac sprayed him. *See, e.g.*, Doc. 39-1 at 1; Doc. 39-2 at 1. Defendant Issac claims he did not "forcibly grab [Plaintiff's] arm and break it." Doc. 39-2 at 2. Likewise, Defendant Key states that he did not witness Defendant Issac "grab [Plaintiff's] arm and break it." Doc. 39-1 at 1. Defendants Issac and Key suggest that Plaintiff's arm was broken during the June 15 stabbing incident. *See* Doc. 39-1 at 1; Doc. 39-2 at 1–2; *see also* Doc. 33-2 (Plaintiff's body chart completed on June 29 stating, "Upon full body inspection; no bruising, abrasions, or injury noted. Redness to both eyes due to being sprayed.").[4]

---

[4] In their response, Defendants state that Plaintiff first mentioned his broken arm "nearly two years after [June 29, 2017]." Doc. 33 at 6. This contention is incorrect. Shortly after the incident, Plaintiff repeatedly told medical providers that his arm was broken in an altercation with correctional officers. *See* Doc. 20-2 at 39, 45, 57. Upon his transfer from Donaldson Correctional Facility to Kilby Correctional Facility in January 2018, Plaintiff continued to so state. Doc. 20-3 at 31. Defendants also contend that a series of post-

## IV. DISCUSSION

### A. Preliminary Matters

Plaintiff alleges violations of the Eighth and Fourteenth Amendments under theories of excessive force, failure to intervene/failure to protect, deliberate indifference to medical needs, and supervisory liability. Plaintiff clarifies in his response that he is suing Defendants in their individual capacities. Doc. 55 at 9. Therefore, the Court will not analyze any official-capacity claims.[5] Furthermore, because Plaintiff was a state inmate at all relevant times, the Court must analyze his excessive force, failure-to-intervene/failure to protect, and medical deliberate indifference claims under the Eighth Amendment, not the Fourteenth Amendment. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations omitted); *Whitley v. Albers*, 475 U.S. 312, 327 (1986). Thus, Defendants are entitled to judgment as a matter of law on his Fourteenth Amendment claims.

### B. Excessive Force—Defendant Issac

To establish a claim for excessive force based on a prison official's use of force, the prisoner must show the official applied the force maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Courts consider the following non-exhaustive list of factors to

_____

incident photographs fail to substantiate Plaintiff's assertion that his arm was "so broken it needed 8 screws and a plate." Doc. 33 at 3 (citing Doc. 33-10). As discussed, however, Plaintiff's post-incident medical records, which include surgery reports, radiology reports, and records from the DOC's own medical providers, show that Dr. Chung operated on Plaintiff's arm and inserted a plate and screws in it. *Supra* Part III(A). Thus, whether Plaintiff had a broken arm as of June 29, 2017 is not reasonably in dispute.

[5] Plaintiff's clarification that he is asserting only individual-capacity claims amounts to an abandonment of his request for unspecified injunctive relief. *See McGuire v. Strange*, 83 F. Supp. 3d 1231, 1242 n.8 (M.D. Ala. 2015); *Ingalls v. U.S. Space & Rocket Ctr.*, No. 2:14-CV-699-WKW, 2015 WL 4528687, at *8 (M.D. Ala. July 27, 2015).

determine whether a prison official's use of force is malicious and sadistic: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the inmate's injury, if any. *Id.* at 7.

Here, a reasonable juror could conclude that Defendant Issac used excessive force on Plaintiff when he removed his arm from the tray slot. Although factors one, two, and four slightly favor Defendant Issac, factors two and five overwhelmingly favor Plaintiff. Therefore, the weight of the factors supports a reasonable finding that this alleged use of force was malicious and sadistic.

Factor one favors Defendant Issac somewhat. Nondefendant Cargle states that Plaintiff's leaving his arm in the tray slot was a "negative behavior" (Doc. 33-9), though Defendants do not cite any DOC rules or regulations to support this assertion. Plaintiff contends that Defendant Issac did not need to remove his arm from the slot because (1) he could have "alerted the supervisor" and (2) "tray slots are left open in the Restrictive Housing Unit daily when not feeding." *See* Doc. 55 at 6, 12. However, Plaintiff submits no admissible evidence to support his apparent assertion that it is appropriate for prisoners to stick their arms through tray slots to request or protest a perceived lack of medical care. Additionally, "[p]rison administrators [] should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (citations omitted); *see also Bennett v. Parker*, 898 F.2d

1530, 1533 (11th Cir. 1990) ("Prison guards . . . need not wait until disturbances reach dangerous proportions before responding."). Therefore, Plaintiff's "negative behavior" could be viewed as disruptive, supporting *some* need for force.

Factor two strongly favors Plaintiff. The evidence supports a reasonable inference that, in removing Plaintiff's arm from the tray slot, Defendant Issac used enough force to break it. Although Defendant Issac may have had some need to remove Plaintiff's arm from the tray slot, grabbing and twisting it with enough force to break it is not reasonably related to this need. However, whether Defendant Issac grabbed and twisted Plaintiff's arm and then sprayed him or, as Defendant Issac contends, only sprayed him "presents us with a classic swearing match, which is the stuff of which jury trials are made." *Sears*, 922 F.3d at 1208 (citation and internal quotation marks omitted).

Defendants also suggest that Plaintiff's arm was broken during the June 15 stabbing incident. However, the medical records before June 29, 2017, show no damage to his right arm other than a cut. Doc. 55 at 16 (citation omitted). Accordingly, Plaintiff's multiple stab wounds, including one in his right forearm, do not support an inference that this attack caused his right ulnar fracture. Notably, there are several medical records diagnosing Plaintiff's ulnar fracture shortly after the June 29 incident, and Plaintiff started attributing his elbow pain and the fracture to the June 29 incident shortly thereafter. Crediting Plaintiff's evidence and drawing all reasonable inferences in his favor, factor two strongly favors him.

As with factor one, factor three favors Defendant Issac, albeit negligibly. Defendant Issac reasonably could have perceived Plaintiff's projection of his arm through the tray slot

as threatening insofar as it was disruptive, but there is no evidence that this action posed an immediate or significant threat to the safety of Plaintiff, his cellmate, or any correctional staff. For instance, there is no evidence that Plaintiff was trying to strike Defendant Issac, threatening him, or otherwise acting violently. Rather, the parties' evidence indicates that Plaintiff was expressing his desire to obtain medical treatment. Furthermore, because Plaintiff declares that his cellmate had already received his tray, it is inferable that Plaintiff's actions did not prevent Defendant Issac from feeding Plaintiff's cellmate. Accordingly, factor three marginally favors Defendant Issac.

Factor four slightly favors Defendant Issac as well. The undisputed evidence is that Defendants Danzey and Thompkins escorted Plaintiff to the health care unit shortly after the incident, where he was decontaminated. *See, e.g.*, Doc. 33-1; Doc. 33-5 at 1; Doc. 33-6 at 1; Doc. 55-1 at 2. Defendant Issac did not escort Plaintiff to the health care unit, and there is no evidence he sought medical assistance for Plaintiff in connection with his use of force or otherwise. However, there is no indication that Defendant Issac attempted to impede Defendants Danzey and Thompkins or otherwise interfered with Plaintiff's health care after Defendant Issac used force on him. Thus, factor four arguably favors Defendant Issac.[6]

Factor five, the extent of the injury, overwhelmingly favors Plaintiff. Plaintiff's evidence supports a reasonable finding that Defendant Issac grabbed and twisted his arm hard enough to break it. The evidence shows that Dr. Chung operated on Plaintiff's broken

---

[6] Plaintiff alleges that Defendant Issac was deliberately indifferent to his medical needs because he ignored his requests for medical treatment. *See infra* Part IV(D). However, this allegation relates primarily to conduct that occurred before Defendant Issac used force on Plaintiff.

arm and that the healing process took around five months. *See* Doc. 20-2 at 50–54; Doc. 20-3 at 19. This injury is significant and, coupled with the other evidence, supports a reasonable finding that the force Defendant Issac allegedly used to remove Plaintiff's arm was excessive. *See Rodriguez v. Powell*, No. 517CV00387MTTCHW, 2019 WL 2479301, at *7 (M.D. Ga. Jan. 31, 2019) ("[T]he broken bone shows that [the correctional officer] used a significant amount of force when closing the tray flap."), *report and recommendation adopted sub nom. Rodriguez v. Clupper*, 2019 WL 1237146 (M.D. Ga. Mar. 18, 2019); *cf. Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002) ("[The prisoner's] multiple rib fractures, back injuries, lacerations to the scalp, and abdominal injuries requiring hospitalization for nine days and rehabilitation for months [ ] could hardly be the result of a de minimis application of force."). In sum, a reasonable juror could conclude that Defendant Issac maliciously and sadistically removed Plaintiff's arm from the tray slot to harm him. Thus, summary judgment should be denied on this theory of excessive force.

A reasonable juror could also conclude that Defendant Issac used malicious and sadistic force on Plaintiff when he sprayed him with chemical agent. Plaintiff declares that Defendant Issac sprayed him *after* he removed Plaintiff's arm from the tray slot. Doc. 1-1 at 2; Doc. 55-1 at 2. Defendants contend that Defendant Issac sprayed Plaintiff while his arm was in the tray slot. *See, e.g.*, Doc. 33-1. The jury must decide this dispute of material fact.

Accepting Plaintiff's version of the events as true, the balance of the *Hudson* factors favors him. Factor one would favor Plaintiff because his arm was no longer in the slot when

Defendant Issac sprayed him, so a juror could reasonably conclude that Defendant Issac did not need to spray Plaintiff at that point. Likewise, factor three would favor Plaintiff because, if his arm was no longer in the tray slot when Defendant Issac sprayed him, a juror could reasonably conclude that Plaintiff did not pose a threat to anyone.

Factors two and five also favor Plaintiff, although less heavily than factors one and three. Plaintiff had to be decontaminated after Defendant Issac sprayed him, and the chemical agent caused redness to both his eyes and allegedly blinded him. Doc. 1-1 at 2; Doc. 33-1; Doc. 33-2 at 1. Although this is not an extensive injury, on Plaintiff's version of the facts, there was no need for Defendant Issac to administer the spray that caused it. Therefore, factors two and five suggest that Defendant Issac used excessive force in spraying Plaintiff with chemical agent. *See Sconiers v. Lockhart*, 946 F.3d 1256, 1268 (11th Cir. 2020) ("Pepper-spraying . . . a person . . . without penological justification certainly offends common standards of decency.").[7]

In sum, drawing all reasonable inferences in Plaintiff's favor, the balance of the *Hudson* factors favors him. Accordingly, a reasonable juror could conclude that Defendant Issac maliciously and sadistically sprayed Plaintiff with chemical agent after removing his arm from the tray slot, and Defendants' motion for summary judgment should be denied as to this theory of excessive force.

Defendant Issac contends that he has qualified immunity from damages. *See* Doc. 33 at 7–8. However, "[f]or claims of excessive force in violation of the Eighth . . .

---

[7] Factor four favors Defendant Issac because Plaintiff was promptly decontaminated after being sprayed.

Amendment[], . . . a plaintiff can overcome a defense of qualified immunity by showing only the first prong, that his Eighth . . . Amendment rights have been violated." *Fennell v. Gilstrap*, 559 F.3d 1212, 1216–17 (11th Cir. 2009), *abrogated on other grounds as stated in Patel v. Lanier Cty. Ga.*, 969 F.3d 1173, 1181 (11th Cir. 2020). The Eleventh Circuit "created this rule because, for an excessive-force violation of the Eighth . . . Amendment[], the subjective element required to establish it is so extreme that every conceivable set of circumstances in which this constitutional violation occurs is clearly established to be a violation of the Constitution[.]" *Id.* at 1217. Accordingly, Defendant Issac is not entitled to qualified immunity on Plaintiff's excessive force claim.

### C. Failure to Intervene/Failure to Protect—Defendants Key, Myers, Danzey, and Thompkins

Plaintiff contends that Defendant Key failed to intervene in Defendant Issac's alleged use of excessive force because he "did not thing to stop [Defendant] Issac." *See* Doc. 55 at 2, 8; Doc. 55-1 at 2. A correctional "officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *See Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (collecting cases). "However, in order for liability to attach, the officers must have been in a position to intervene." *Terry v. Bailey*, 376 F. App'x 894, 896 (11th Cir. 2010) (per curiam) (citation omitted); *see also Clark v. Argutto*, 221 F. App'x 819, 826 (11th Cir. 2007) (per curiam) ("[L]iability can be imposed upon prison guards who are present at the scene and who are in a position to intervene but fail to take reasonable steps to stop excessive force by other guards . . . ."). When "the relevant events

happen[] so quickly," the record may preclude a finding that the officers were in a position to intervene. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740 n.25 (11th Cir. 2010); *see also Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996) ("The three blows were struck in such rapid succession that [the officer] had no realistic opportunity to attempt to prevent them.") (citation and internal quotation marks omitted).

Here, the evidence supports the conclusion that Defendant Key was not in a position to stop Defendant Issac from allegedly grabbing and twisting Plaintiff's arm and spraying him with chemical agent. On Plaintiff's version of the facts, Defendant Issac grabbed his arm "without warning." Doc. 55 at 3. Plaintiff's allegations support the inference that little time transpired between Defendant Issac's grabbing and twisting of his arm and dispersion of the chemical agent. *See* Doc. 1-1 at 2; Doc. 55-1 at 2. Because the evidence shows that "the relevant events happened so quickly," a reasonable juror could not conclude that Defendant Key failed to intervene in Defendant Issac's uses of force. *See Brown*, 608 F.3d at 740 n.25.

Plaintiff also contends that Defendants Key, Danzey, Thompkins, and Myers failed to protect him. Doc. 55 at 5, 7. However, his unsworn assertions are broad and conclusory. *See* Doc. 55 at 5 (asserting that Defendant Key "is supposed to protect inmates from any assault"); Doc. 55 at 7 ("Warden . . . Myers, Captain . . . Danzey and . . . Lieutenant . . . Thompkins failed to protect [P]laintiff as each one . . . [is] supposed to provide him with such [sic] . . . ."). As discussed, these unsworn assertions are not evidence for summary judgment purposes and, in any event, are too broad and conclusory to "defeat [Defendants'] summary judgment motion." *See Ellis*, 432 F.3d at 1326; *see also Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) ("[L]egal conclusion[s] couched as [] factual allegation[s]" fail state a claim for relief under § 1983.) (citation and internal quotation marks omitted).

Therefore, the undersigned concludes that a reasonable juror could not conclude that Defendants Key, Myers, Danzey, or Thompkins failed to intervene in or protect Plaintiff from Defendant Issac's alleged uses of force, and summary judgment should be granted to Defendants on this claim.

### D. Medical Deliberate Indifference—Defendants Issac and Key

"To show that a prison official acted with deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (citation omitted). "First, the plaintiff must prove an objectively serious medical need." *Id.* (citation omitted). "Second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Id.* (citation omitted).

"A serious medical need is considered one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (citation and internal quotation marks omitted). "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (alteration adopted) (citation and internal quotations marks omitted).

"Severe pain that is not promptly or adequately treated can [] constitute a serious medical need depending on the circumstances." *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam) (citations omitted). "But a plaintiff's statement that he experienced some pain or discomfort is not enough; the prisoner's pain must be objectively

so severe that the failure to treat it deprives him 'of the minimal civilized measure of life's necessities.'" *Brennan v. Thomas*, 780 F. App'x 813, 820 (11th Cir. 2019) (per curiam) (quoting *Farmer*, 511 U.S. at 834). A plaintiff "does not necessarily need to show that the delay in medical care exacerbated his condition because the delay in care is, itself, a wanton infliction of pain and a constitutional violation." *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).

Here, it is undisputed that Plaintiff was hospitalized for two days after being stabbed multiple times on June 15, 2017. *See, e.g.*, Doc. 20-2 at 10–14, 26. In addition to his multiple lacerations, Plaintiff was diagnosed with "left tension pneumothorax" and shortness of breath with "marked distress." *See id.* at 21, 24–26. Plaintiff's chest tube was removed, and he was given medication intravenously for pain and itching. *Id.* at 33. Upon discharge from the hospital, Plaintiff received orders to follow up with his treating physician in two weeks. *Id.* at 26, 33.

Upon his return to Easterling, Plaintiff complained of shortness of breath and chest pain in the area where his chest tube was removed. *Id.* at 35. Plaintiff was prescribed Tylenol, Naprosyn, Zantac, and Bactrim DS. *Id.* at 27, 35–37. On June 19, Plaintiff received a chest X-ray and was diagnosed with "[l]eft lower lobe pneumonia." *Id.* at 38. At a medical appointment on June 22, Plaintiff complained of or was diagnosed with side pain. *See id.* at 39.

Plaintiff declares that on June 29 he began having severe chest pain in the morning. Doc. 55-1 at 1. Plaintiff contends that he started telling Defendants Issac and Key that he needed to go to the infirmary but was ignored. *Id.* Plaintiff claims he continued to

experience severe chest pain at lunch time.[8] Doc. 1-1 at 2. Therefore, he put his arm in his tray slot, told Defendant Issac he had "recently been stabbed 19 times and was having chest pain," and repeated that he needed to go to the infirmary, whereupon Defendant Issac broke his arm. *See id.*; Doc. 55-1 at 1–2.

These facts, if believed, support a reasonable finding that Plaintiff had diagnosed pectoral, pulmonary, or respiratory conditions that caused him intermittent severe pain. *Cf. Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam) ("Deliberately inflicted pain . . . does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary."). However, Plaintiff's medical records do not clearly support this. Plaintiff's X-ray on June 30 showed "[n]o acute cardiopulmonary disease" and lung fields that were "clean without mass, infiltrate, congestion, or effusion," and, although he complained of chest pain, shortness of breath, and coughing in late July and November 2017, his medical records contain no clear findings corroborating his subjective complaints. Doc. 20-2 at 44. *See supra* pp. 6–7. When "ruling on summary judgment motions," "[c]redibility determinations [and] the weighing of the evidence . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. When medical records fail to corroborate, or even contradict, a prisoner's allegations of health problems or severe pain, the record does not necessarily warrant summary judgment "since those records involve people and all their attendant mental infirmities, biases, and limitations-in their creation." *See Sears v. Warden Okeechobee Corr. Inst.*, 762 F. App'x

---

[8] Defendants contend and Plaintiff has not disputed that Defendants Issac and Key were serving lunch at 11:30 a.m.

910, 916–17 (11th Cir. 2019) (per curiam). Accordingly, whether Plaintiff had pectoral, pulmonary, or respiratory conditions that caused him intermittent severe pain presents genuine factual issues for trial. Thus, the question is whether a reasonable juror could conclude that Defendants Issac and Key were deliberately indifferent to this alleged serious medical need.

"To establish the second element, deliberate indifference to the serious medical need, the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." *Brown*, 387 F.3d at 1351 (citation omitted). "When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Hughes*, 894 F.2d at 1538.

Here, Plaintiff declares that he told Defendants Issac and Key that he was in severe pain over a period that inferably lasted three hours. Plaintiff further asserts that he told Defendant Issac that he had recently been stabbed 19 times. Plaintiff declares that he and his cellmate "beat on the door . . . to no avail" in the morning to get the attention of Defendants Issac and Key *See* Doc. 55-1 at 1. Coupled with Plaintiff's repeated complaints of severe chest pain, this fact permits a reasonable conclusion that Defendants "dr[ew] the inference" that Plaintiff was experiencing severe pain. *See Farmer*, 511 U.S. at 837. Thus, a reasonable juror could find that Defendants had subjective knowledge of Plaintiff's serious medical need.

Moreover, Plaintiff declares that Defendants ignored his repeated requests for medical treatment. Although Plaintiff was taken to the health care unit after Defendant

Issac sprayed him and allegedly broke his arm, the evidence does not show that Defendants Issac and Key "were involved in sending [Plaintiff] to the [health care unit]." *See Hughes*, 894 F.2d at 1538; *see also supra* pp. 6–7. Indeed, there is no evidence that Defendants Issac and Key took any steps to investigate Plaintiff's complaints of severe pain at any time. Hence, the fact that Defendants Issac and Key did not interfere with Plaintiff's transport to the health care unit does not preclude a finding that they disregarded his serious medical need.

For similar reasons, the evidence supports a reasonable finding that Defendants Issac and Key intentionally disregarded Plaintiff's serious medical needs. On Plaintiff's version of events, Defendants completely ignored his repeated requests for medical assistance for three hours despite knowing that he was experiencing severe pain in connection with a brutal stabbing. Although Defendants Issac and Key dispute that Plaintiff requested medical treatment (Doc. 39-1 at 1; Doc. 39-2 at 1), the jury must resolve this genuine factual dispute. A reasonable juror could find that their alleged disregard of Plaintiff's medical needs was more than negligent.

Defendants Issac and Key also assert the defense of qualified immunity to this claim. *See* Doc. 33 at 7–8. "A government official asserting a qualified immunity defense bears the initial burden of showing he was acting within his discretionary authority." *Valderrama*, 780 F.3d at 1112 (citation and internal quotation marks omitted). "After the official makes this showing, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Id.* (citation and internal quotation marks omitted). "To determine

whether a right was clearly established, [the Eleventh Circuit] look[s] to binding decisions of the Supreme Court of the United States, [the Eleventh Circuit], and the highest court of the relevant state . . . ." *Id.* (citation omitted). "In the light of these decisions, [the Eleventh Circuit] ask[s] whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (citation and internal quotation marks omitted).

"While officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours, with materially identical facts, before [courts] will allow suits against them." *Id.* (citation and internal quotation marks omitted). "A principle of constitutional law can be clearly established even if there are notable factual distinctions between the precedents relied on and the cases then before the [c]ourt, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Id.* (citation and internal quotation marks omitted). "The salient question [] is whether the state of the law gave [Defendants] fair warning that their conduct was unconstitutional." *Id.* at 1113 (citation and internal quotation marks omitted).

Here, Defendants Issac and Key are not entitled to qualified immunity. Although Defendants did not address this issue, the Court assumes arguendo that they were acting within their discretionary authority when allegedly ignoring Plaintiff's requests for medical treatment. Thus, the question is whether it was clearly established by June 29, 2017, that their conduct constituted medical deliberate indifference.

It was. As noted, "[w]hen prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Hughes*, 894 F.2d at 1538. Furthermore, "[s]evere pain that is not

promptly or adequately treated can [] constitute a serious medical need." *Melton*, 841 F.3d at 1222 (citations omitted); *see also Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) ("[D]elays of days or even hours in delivering necessary treatment may constitute deliberate indifference . . . .") (citations omitted). Additionally, a plaintiff "does not necessarily need to show that the delay in medical care exacerbated his condition because the delay in care is, itself, a wanton infliction of pain and a constitutional violation." *Valderrama*, 780 F.3d at 1116.

Although there need not be a case on all fours to overcome qualified immunity, *Hughes* presents close factual parallels to this case. There, a prisoner attacked the plaintiff at 10:30 a.m., after which the plaintiff told the defendant he thought his foot was broken. 894 F.3d at 1536. The defendant saw the plaintiff hop on one leg due to his severely swollen foot. *See id.* at 1538–39. Although the defendant promised to send someone to look at it, no one ever came. *Id.* After 3:00 p.m., the plaintiff managed to get another correctional officer to facilitate medical care. *See id.* A doctor saw the plaintiff sometime after 4:30 p.m. and diagnosed the plaintiff with a broken foot. *See id.* The *Hughes* court denied summary judgment because "there [was] a genuine issue of material fact as to whether [the defendant] knew of [the plaintiff's] condition during the hours in which no medical care was provided." *Id.* at 1539.

Here, similarly, Plaintiff contends that he began telling Defendants Issac and Key about his severe chest pain at 8:30 a.m. but that they ignored him for three hours. Plaintiff further contends he expressly told Defendant Issac that he had been stabbed multiple times and Defendant Issac then removed his arm from the tray slot with enough force to break it.

Although Plaintiff was subsequently taken to the health care unit, there is no evidence Defendants Issac and Key "were involved in sending [Plaintiff] to the [health care unit]." *See id. at 1538*. Because the plaintiff in *Hughes* hopped on one leg and had a severely swollen foot, he arguably showed greater outward signs of physical injury and pain than Plaintiff. However, Plaintiff contends that he and his cellmate banged the cell door and pleaded for help for hours, which, coupled with Plaintiff's complaints of severe pain, supports a reasonable inference that Defendants Issac and Key would have known he needed help.

Accordingly, *Hughes* gave Defendants Issac and Key the required fair notice that their alleged conduct was unlawful. While the cases cited above are not "'on all fours' with the facts before [the Court]," the "principles from relevant precedents were clear enough that [these Defendants] had notice." *See Valderrama*, 780 F.3d at 1122 (citation omitted).

Qualified immunity does not shield Defendants Issac and Key from liability on Plaintiff's medical deliberate indifference claim, and summary judgment should be denied to Defendants on this claim.

### E.  Supervisory Liability—Defendants Myers, Danzey, and Thompkins

In his verified complaint, Plaintiff alleges that "Defendants were not properly trained on how to respond when an inmate is in need of medical care, and the procedure on extracting an inmate from his cell." Doc. 1-1 at 3. Plaintiff's affidavit contains no allegations regarding this alleged failure to train. *See* Doc. 55-1.

In his unverified response, Plaintiff contends that Defendants Myers, Danzey, and Thompkins ("Supervisory Defendants") unlawfully gave Defendant Issac "unsupervised

authority to use force against [Plaintiff]" and failed to "properly train[]" Defendant Issac about "when force is necessary and what amount of force to use in certain circumstances." Doc. 55 at 2. He also asserts that "Warden . . . Myers, Captain . . . Danzey, and Lieutenant . . . Thompkins relinquished their authority and gave unfettered authority to [Defendants Issac and Key,] which allowed them to take whatever action they wanted to take no matter what the situation may be" and that "Defendant Warden . . . Myers, Captain . . . Danzey and Lieutenant . . . Thompkins acted in bad faith allowing lower level officers the unfettered power to have unsupervised use of force." *See id.* at 6, 9.

There is no vicarious liability under § 1983. *See Iqbal*, 556 U.S. at 677. For a supervisor to be liable for the misconduct of his subordinates under § 1983, he must be causally connected to a constitutional violation, such as implementing an unlawful policy, disregarding multiple prior reports of misconduct, or failing to train a subordinate with a consequent deprivation of a person's civil rights. *See Alston v. Swarbrick*, 954 F.3d 1312, 1321 (11th Cir. 2020) (citations omitted); *Piazza v. Jefferson Cnty., Ala.*, 923 F.3d 947, 957 (11th Cir. 2019) (citations omitted).[9] Generally, a single incident of a constitutional violation is insufficient to establish a claim of supervisory liability. *See Piazza*, 923 F.3d at 957 (citations omitted).

Here, Plaintiff has not shown that the alleged excessive force and medical deliberate indifference were anything but isolated incidents. Plaintiff's remaining "vague and conclusory allegations do not establish supervisory liability." *See Gonzalez v. Reno*, 325

---

[9] Plaintiff does not allege and the evidence does not show that the Supervisory Defendants "personally participate[d] in the alleged constitutional violation[s]." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999).

F.3d 1228, 1235 (11th Cir. 2003). Accordingly, summary judgment should be granted to Defendants Myers, Danzey, and Thompkins on Plaintiff's supervisory liability claims.

### F.    Assault and Battery

In his prayer, Plaintiff states that he seeks pendent jurisdiction of his state law assault and battery claims.[10] Doc. 1 at 4. Defendants do not meaningfully address this claim in their motion for summary judgment. *See* Doc. 33 at 2–3, 6. Likewise, Plaintiff does not refer to any assault and battery claim in his responses. Docs. 55, 59. However, because Plaintiff pleaded this claim and because he alleges that Defendant Issac used force on him, the Court considers whether this claim presents a genuine issue for trial.

"Under Alabama law, a claim of assault and battery requires a plaintiff to show: '(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner.'" *Williams v. ATP Huntsville, LLC*, No. 5:20-CV-1229-LCB, 2021 WL 5277157, at *2 (N.D. Ala. Mar. 31, 2021) (quoting *Dolgencorp, LLC v. Spence*, 224 So. 3d 173, 180 (Ala. 2016)).[11] Yet, under Alabama law, correctional officers may use reasonable force to maintain order in prisons. *Compare Underwood v. City of Bessemer*, No. 2:15-CV-01585-JHE, 2019 WL 4392523, at *16 (N.D. Ala. Sept. 12, 2019) ("In making the arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest." (alteration adopted) (citation and internal quotation

---

[10] As with his excessive force claim, Plaintiff's allegations compel the conclusion that he asserts his assault and battery claim against only Defendant Issac.

[11] "[W]here plaintiffs allege physical contact, courts sometimes treat assault and battery as a single claim." *Poague v. Huntsville Wholesale Furniture*, No. 7:18-CV-00005-LSC, 2020 WL 6363983, at *19 n.13 (N.D. Ala. Oct. 29, 2020) (citations omitted).

marks omitted)), *with Ex parte Dixon*, 55 So. 3d 1171, 1177 (Ala. 2010) ("Prison guards are law enforcement officers, particularly since it is their duty to force the convicts to obey and endure the sentence of the law." (alteration adopted) (citation and internal quotation marks omitted)). Here, for the same reasons a reasonable juror could conclude that Officer Issac used excessive force on Plaintiff in violation of the Eighth Amendment, a reasonable juror could conclude that he intentionally touched Plaintiff in a harmful manner and that it was unreasonable.

Defendant Issac contends that he enjoys "state-agent immunity" on this claim. *See* Doc. 33 at 7–8. "Under this framework, the officer first must demonstrate that the plaintiff's claims arise from a function that would entitle the officer to immunity." *Patel v. City of Madison, Ala.*, 959 F.3d 1330, 1344 (11th Cir. 2020) (alteration adopted) (citation and internal quotation marks omitted). For analytical ease, the Court assumes that Plaintiff's assault and battery claim arises from a function that would entitle Defendant Issac to state-agent immunity. Thus, Plaintiff "must shoulder the burden of showing that [Defendant Issac] acted willfully, *maliciously*, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Id.* (emphasis added) (citation and internal quotation marks omitted).

As explained above, a reasonable juror could conclude that Defendant Issac's use of force on Plaintiff was malicious and sadistic rather than a good-faith effort to maintain order. Thus, at this stage, Defendant Issac has not shown he is entitled to state-agent immunity, and summary judgment should be denied on Plaintiff's assault and battery claim.

## V.    CONCLUSION

Accordingly, the Magistrate Judge RECOMMENDS that Defendants' Motion for Summary Judgment (Doc. 33) be GRANTED IN PART and DENIED IN PART, as follows:

1.    Summary judgment should be GRANTED to Defendants on Plaintiff's Fourteenth Amendment claim.

2.    Summary judgment should be DENIED on Plaintiff's Eighth Amendment excessive force claim against Defendant Issac.

3.    Summary judgment should be GRANTED to Defendants on Plaintiff's Eighth Amendment failure to intervene/failure to protect claim.

4.    Summary judgment should be DENIED on Plaintiff's Eighth Amendment medical deliberate indifference claim against Defendants Issac and Key.

5.    Summary judgment should be GRANTED to Defendants on Plaintiff's supervisory liability claim.

6.    Summary judgment should be DENIED on Plaintiff's state-law assault and battery claim against Defendant Issac.

Further, it is ORDERED that by **July 25, 2022**, the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered by the Court. This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); 11TH Cir. R. 3–1. *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

DONE this 11th day of July, 2022.

/s/ Kelly Fitzgerald Pate
KELLY FITZGERALD PATE
UNITED STATES MAGISTRATE JUDGE